**COMMONWEALTH of Kentucky,**
**Appellant**

v.

**Danny Lee OUSLEY, Appellee.**

**No. 2011–SC–000403–DG.**

Supreme Court of Kentucky.

March 21, 2013.

Jack Conway, Attorney General, David Wayne Barr, Assistant Attorney General, Office of the Attorney General, Office of Criminal Appeals, Frankfort, KY, for appellant.

Louis W. Rom, Lexington, KY, for appellee.

Opinion of the Court by Justice NOBLE.

The police in this case walked onto the Appellee's property and into an area near his home late at night to search trash in closed trash containers which ended up containing evidence of drug trafficking. The containers had not been put out on the street for trash collection. Because the police invaded the curtilage without a search warrant, the search was illegal. Thus, this Court affirms the decision of the Court of Appeals, which found that the trial court erred in not suppressing the evidence.

## I. Background

Appellee Danny Lee Ousley lived in a single-family townhouse on a small lot in Lexington. The houses were located close together, separated only by single-car driveways, which touched the houses on each side. Ousley's driveway ran up the left side of his house (as viewed from the street) and extended to the back of his property. His home was set farther back from the street than the home on the left (again, as viewed from the street), which created a staggered effect to create a measure of privacy.

The wall of the house next to Ousley's driveway had no window looking directly into the area (and may not have had a window at all, based on the general architecture evident in the photographs of the scene). This further increased privacy in this high density urban neighborhood. No sidewalk ran from the street to Ousley's front door; instead, a short sidewalk ran from the driveway to the front door, which required a person with legitimate business

at the house to approach the front door by walking up the driveway to the sidewalk.

Ousley had a small storage shed in his driveway some distance back from the front of the house. He ordinarily parked his car in the driveway. His trash cans were usually stored on the driveway. Though the exact location is an issue in this case, the trash cans were usually placed on the left side of the driveway almost touching the siding of the house on the left and somewhere between the storage shed and the front plane of Ousley's house.

In 2009, Lexington police received two tips that Ousley was selling methamphetamine from his home. In response to the tips, Detective Keith Ford investigated, including surveillance of Ousley's residence. Nothing happened, so Ford turned to his "last resort," a warrantless trash pull to confirm or refute the tips. He conducted two warrantless "trash pulls" on Ousley's property. In both instances, he walked onto the property late at night and took trash bags from the closed outdoor trash cans.

From the first trash pull, Ford found an envelope addressed to Ousley and a shipping box for a set of digital scales. The second trash pull turned up more mail addressed to Ousley and four plastic "baggies" containing methamphetamine residue.

Detective Ford then obtained a search warrant for Ousley's home. The search found methamphetamine, marijuana, digital scales, and other drug paraphernalia.

Ousley was indicted for first-degree trafficking in a controlled substance (methamphetamine), trafficking in marijuana within 1,000 yards of a school, and possession of drug paraphernalia. He moved to suppress evidence from the trash pulls, claiming that they violated his rights under the Fourth Amendment of the U.S. Constitution and Section 10 of the Kentucky Constitution, and as a result, the search warrant was invalid since it was based on the evidence from the trash pulls.

The trial court heard testimony from Detective Ford and Ousley regarding the trash pulls and concluded they were lawful. The court's analysis focused on the location of the trash cans in relation to Ousley's home at the time of the pulls.

Detective Ford testified that the trash cans were on the left side of the driveway, touching the house next door. On one of the trash pulls, Ousley's car was in the driveway and the trash cans were just "in front" of the car or possibly between the front and the house next door. He had to walk between the next-door house and the car to get to the trash cans. He specifically testified that the trash cans were not behind the car, that is, between the car and the street, but were between the car and the storage shed. He also testified that during the trash pull when the car was not in the driveway (it was across the street), the trash cans were in the same place. He eventually said the trash cans were "even" with the front of Ousley's house, about 20 to 25 feet from the street.

He also testified that the trash cans were a city-issued Herbie Curby (a large trash "toter") and a recycling toter. Trash collection was on Friday for that part of town. The first pull was on Monday night, at approximately 11:30 p.m. The second pull was on Friday, at 12:30 a.m., and on that night, trash cans of other residences had already been moved to the curb for collection in the morning but Ousley's had not.

When cross-examined, he testified that the trash cans were not up against the storage shed, as was depicted in some photographs offered by Ousley's counsel, and repeated that they were instead even

with the front of Ousley's house. He stated that this would allow a person to walk out the front door and directly over to the trash cans without turning to the right or left. He further stated that the trash cans had been placed up against the storage shed ever since a preliminary hearing at which this issue was first discussed.[1]

Ousley also testified about the location of the trash cans. He stated his trash pickup was usually between 7:00 and 8:00 a.m. on Friday morning, and the trash would not be collected unless placed at the curb. He said he typically kept his trash cans on the side of his house next to the storage unit. This meant it was further back in the driveway than the front plane of his house. He claimed his driveway was otherwise too small to keep his car in, and the only place to keep the trash cans was next to the shed. He also testified that his homeowners association barred keeping anything, including trash cans, between the street and the front of the house, which meant the trash cans were not visible from the street. He further testified that near the time of the trash pulls, he had been doing yard work and had stored mulch in the area near the storage shed.

On cross-examination, he testified that it would be impossible to place the trash cans between his car and the next-door house because there was not enough room. He also testified that he never intended to retrieve anything from the trash, and that any illegal substances must have been placed there by some acquaintances that had stayed with him for several weeks.

The trial court asked when he took his trash to the curb for collection, and he replied Friday mornings before he had to be at work at 7:00 a.m. He also testified specifically that he did not like to put the cans out on the street the night before because people would frequently go through them or dump them out.

The trial court made oral findings of fact on the record. As to the first trash pull, the court found that the trash cans rested against the next-door house to the left of Ousley's residence.[2] To get to Ousley's front door, a person would walk up the driveway to the left of the townhouse because there was no sidewalk directly connected to the public sidewalk parallel to the street. The court noted that Detective Ford "guesstimated" that the cans were 20 to 25 feet from the street, and that looking from the street, the cans would be visible unless a car was parked in the driveway. As to the second trash pull, the court noted the trash cans were in approximately the same place.

The court observed that there was a storage unit visible in some of the photos, and described it as being near the rear of the driveway.[3] The court also found that if there was no car in the driveway, the ordinary approach would be to walk up the driveway and turn to the right on the sidewalk to arrive at the front door. The court then stated:

No question, if the car wasn't in the drive way, that did not block my path going up the driveway, that I would go

---

1. Presumably, this means that the detective had returned to observe Ousley's home, though he did not testify to that fact.

2. By identifying Ford's testimony, rather than Ousley's, the Court essentially adopted Ford's description of the location. Indeed, most of the findings were framed as what the detective or, in some circumstances, Ousley testi-

fied to, rather than a definitive resolution of the sometimes-conflicting testimony.

3. This suggests that the storage unit was at the back of Ousley's house, but the photograph to which the court referred while making this finding shows that it was approximately half-way between the front and rear of the house.

from the sidewalk up the driveway, take a right on the short sidewalk in front of the home, and then arrive at the front door. I wouldn't have any occasion to directly walk by these trash cans that were to the left—in the driveway, a little farther back and to the left. I wouldn't have occasion to walk by those trash cans if I was just going to the front of the house.

The court later noted, however, that a person walking from door to door would walk near the location of the trash cans if the car was not in the way. The court also noted that at the time of the trash pulls, neither of the trash cans was at the curb and instead were still "back in the driveway at or about the side of the house on the left."

The court found that the area of the driveway in question left only one place for the trash cans, and that the trash cans were resting at or about the house on the left in front of the storage unit (i.e., between the storage unit and the street). The Court reiterated that the detective testified that the cans were separated some from the storage unit and were closer to the street than shown in the photos.

After making findings, the court worked through its conclusions of law, discussing various cases, including *California v. Greenwood*, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), which it distinguished on the facts. Ultimately, the court turned to whether Ousley had a reasonable expectation of privacy in his trash, which depended on whether the trash was within the protected curtilage of the house.

In analyzing this issue, the court looked at the four factors laid out in *United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), applied by this Court in *Quintana v. Commonwealth*, 276 S.W.3d 753, 757 (Ky.2008). The court concluded that the trash cans were a "very

short distance" from the home—only the width of the one-car driveway—and "pretty close" to the house; that the trash cans were not enclosed and the area in which they were located was open to the street; that the usage of the area was for trash and other storage; that Ousley had taken no steps to protect the area from observation by people passing by; and that the cans could be seen unless a car was in the driveway.

Based on this, the court concluded that the driveway area was not within the protected curtilage and noted that a person would not ordinarily walk past the trash cans to go to the front door but that one *could* do so, especially if going door to door between houses. The court also noted that the area in question was not being used for traditionally "private" matters. Thus, Ousley had no reasonable expectation of privacy in the trash cans or their contents, and the court denied suppression of the evidence.

Ousley subsequently entered a conditional guilty plea to all the charges reserving his right to appeal the suppression question. The trial court sentenced him to five years' imprisonment, probated for five years.

The Court of Appeals held that trash pulls were unlawful searches under *California v. Greenwood*, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), *Quintana v. Commonwealth*, 276 S.W.3d 753 (Ky.2008), and *Smith v. Commonwealth*, 323 S.W.3d 748, 754 (Ky.App.2009), and reversed Ousley's convictions. The court stated that the trash cans had been located directly beside the storage shed, and that the area in question was used for Ousley's "personal and private storage needs."

Based on this, the court held that regardless of whether the trash cans were located within the curtilage, the relevant

question was whether Ousley's expectation of privacy was objectively reasonable, which turned on whether the area in question was publicly accessible. The court concluded that given the configuration of the homes in Ousley's neighborhood and the realities of modern urban living, "it could not reasonably be said that a member of the public would believe he was free to enter into the storage area where [Ousley's] trash toter was located and rummage through the toter for trash." The court held Ousley had a constitutionally recognized expectation of privacy in his trash at the time of the searches that required suppression of the evidence.

The Commonwealth sought discretionary review from this Court, alleging that the Court of Appeals improperly substituted its findings of fact for those of the trial court and erred in finding the searches to be unlawful. This Court granted review primarily to determine the lawfulness of a warrantless search of a person's trash on his property, near his home, and not yet placed for pick up by the usual trash service. The fact that the trash was in a closed trash can was not argued as a relevant factor to the trial court nor at the Court of Appeals.

## II. Analysis

The Commonwealth argues that the Court of Appeals impermissibly ignored the findings of fact by the trial court and substituted its own understanding of what happened to reach its legal conclusion. The Commonwealth also argues that the trash pulls were legal because the trash container was located in an area accessible to the public, as found by the trial court.

This Court finds that the Court of Appeals did substitute its view of the facts for that of the trial court, but also finds that the "objectively reasonable expectation of privacy" test employed by *Greenwood* does not apply under the facts of this case because the trash was in the protected area, or curtilage, of the home. Thus the trash pull was illegal, and the Court of Appeals is affirmed on other grounds.

■ That the trash was in a closed trash can is not the gravamen of this decision, despite the enclosed state of the trash. Under *Greenwood*, closed trash cans are subject to a warrantless search if there is no reasonable expectation of privacy. (Closed trash bags could be searched without a warrant when the trash had been deposited on the curb for pick-up.) But closed trash cans are not subject to a warrantless search when they are in the curtilage of the home, because privacy is guaranteed in the home and its curtilage, absent the recognized exceptions. Thus, *where* the enclosed trash is found is a necessary determination. Such is the case here.

## A. The Court of Appeals differed from the factual findings of the trial court.

In reaching its conclusion, the Court of Appeals stated that the trash cans in this case were located "directly at the side of the shed," which placed them several feet farther into Ousley's property than the specific finding of the trial court that the trash cans were not immediately adjacent to the shed and were closer to the street, even with the front of Ousley's home.

■ But, the factual findings of the trial court in a suppression matter are conclusive so long as they are supported by substantial evidence. *See* RCr 9.78. Thus "a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Roberson v. Commonwealth*, 185 S.W.3d 634, 637 (Ky.2006) (quoting

*Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)).

The Court of Appeals' location of the trash cans deviated from the factual findings of the trial court but did not conclude that the trial court was clearly erroneous. Further, the trial court's findings actually were supported by substantial evidence—the testimony of the police officer—and were not clearly erroneous. Thus, this case is properly analyzed under the facts as found by the trial court.

▇▇▇ That, however, does not by itself require reversal. "Using those facts, the reviewing court then conducts a de novo review of the trial court's application of the law to those facts to determine whether the decision is correct as a matter of law." *Commonwealth v. Jones*, 217 S.W.3d 190, 193 (Ky.2006). Thus no deference is given to the trial court beyond its findings of historical fact. *See Ornelas*, 517 U.S. at 697, 116 S.Ct. 1657. But while the trial court findings of fact differed somewhat from the facts applied by the Court of Appeals, its de novo review of the trial court's legal conclusions reaches the correct result even under the facts as found by the trial court.

**B. The trash cans were located in the curtilage, which is constitutionally protected, and thus the warrantless trash pulls were illegal.**

This Court concludes that the trash pulls in this case were illegal, such that the Court of Appeal's result is correct, but for different legal reasons.

*1. Trash containers located within the curtilage of a house are protected under the Fourth Amendment and Section 10.*

The trash pulls in this case must first be recognized as warrantless searches.

▇▇▇ Warrantless searches are "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (footnote omitted). Though this sounds simple, Fourth Amendment analysis has become complex, involving many considerations. For one thing, those "few specifically established and well-delineated exceptions", such as plain view, plain smell, plain hearing, and open fields, serve to allow warrantless searches, which deviates from the general rule.

And, *Katz* is no longer the exclusive test for deciding whether a Fourth Amendment violation has occurred. *United States v. Jones*, ⸺ U.S. ⸺, ⸺, 132 S.Ct. 945, 950, 181 L.Ed.2d 911 (2012) ("Fourth Amendment rights do not rise or fall with the *Katz* formulation."). In *Jones*, the U.S. Supreme Court reaffirmed that property rights play a part in deciding what is protected from warrantless searches, which originally "was tied to common-law trespass." *Id.* at 949. In deviating from *Katz*, the Court emphasized: "[F]or most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates." *Id.* at 950.

So there is little argument that "persons, houses, papers, and effects" continue to enjoy Fourth Amendment protection. This case focuses on the boundaries of Fourth Amendment protection for warrantless searches of houses and effects, particularly to trash and the curtilage, the protected area around the house which has the same privacy protection as the house.

**a. Trash (effects).**

The most recent United States Supreme Court authority specifically on whether a person's trash is protected under the

Fourth Amendment is *California v. Greenwood*, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), which addressed a series of searches of "trash, which was placed on the street for collection at a fixed time, was contained in opaque plastic bags, which the garbage collector was expected to pick up, mingle with the trash of others, and deposit at the garbage dump." *Id.* at 39, 108 S.Ct. 1625. The garbage was only on the street a short time and "there was little likelihood that it would be inspected by anyone." *Id.* But the police had the regular garbage collector take the bags and turn them over without intermingling them with other garbage. *Id.* at 37, 108 S.Ct. 1625.

The Supreme Court ruled that the search of the garbage "would violate the Fourth Amendment only if respondents manifested a subjective expectation of privacy in their garbage that society accepts as objectively reasonable." *Id.* at 39, 108 S.Ct. 1625. The Court concluded that while the defendants may have had a subjective expectation of privacy, they had nevertheless "exposed their garbage to the public sufficiently to defeat their claim to Fourth Amendment protection." *Id.* at 40, 108 S.Ct. 1625. The Court explained:

> It is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public. Moreover, respondents placed their refuse at the curb for the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through respondents' trash or permitted others, such as the police, to do so.

*Id.* (citations and footnotes omitted).

The Court then concluded: "Accordingly, having deposited their garbage '*in an area particularly suited for public inspec-*tion* and, in a manner of speaking, public consumption, for the express purpose of having strangers take it,' (emphasis added.) respondents could have had no reasonable expectation of privacy in the inculpatory items that they discarded." *Id.* at 40–41, 108 S.Ct. 1625 (quoting *United States v. Reicherter*, 647 F.2d 397, 399 (3d Cir. 1981)).

Based on the specific language used by the Supreme Court referring to "on or at the side of a public street," "placed their refuse at the curb," "for the express purpose of conveying it to a third party," a reasonable person might assume that the language established parameters defining where Fourth Amendment protection of the house or effects stops—the public domain. But Courts continue to struggle with whether *Greenwood* is intended to cover *all* warrantless searches of trash, regardless of where the trash may be.

There is some confusion over whether *Greenwood* means a warrantless search is appropriate whenever trash has been abandoned for collection (the so-called abandonment theory); has been made readily accessible to the public even if not abandoned; or is protected within the curtilage of the home.

The lower federal courts have disagreed about whether Fourth Amendment protection extends to trash based on its location. *Compare United States v. Comeaux*, 955 F.2d 586, 589 (8th Cir.1992) (arguing that *Greenwood's* public-accessibility test alone is applicable, even when the garbage is in the curtilage), *with United States v. Tate*, 524 F.3d 449, 452 (4th Cir.2008) (describing *Greenwood's* holding as "requiring trash to be abandoned for collection outside the curtilage of the home in order for an officer's search through it to be constitutional"); *with United States v. Redmon*, 138 F.3d 1109, 1114 (7th Cir.1998) (rejecting a bright line curtilage rule but holding

that being inside the curtilage was a factor to consider in deciding whether there was a protected privacy interest).

The *Redmon* decision is instructive because six separate opinions—with eight judges concurring and five dissenting—explored the various theories of how *Greenwood* works and whether location of the trash matters. Of those opinions, the most cogent view of the impact of the location of trash came from then Chief Judge Posner, who opined that police may not enter the curtilage to collect trash without a warrant, but that they may examine the trash at will once it is beyond the curtilage. *Redmon*, 138 F.3d at 1121 (Posner, J., dissenting).

Thus, the only relevant question in the case for him was whether the trash cans were within the curtilage of the house. *Id.* at 1132. If they were (and he concluded they were), then they were protected by the Fourth Amendment. Under his approach, the question whether the trash had been abandoned was irrelevant, since it was still within the curtilage when taken. That trash collectors had implicit permission to enter the property was of no consequence, since that was a limited permission and the police took the trash instead of the trash collectors. *See* 1 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 2.6 (4th ed. 2007) ("There is no principle in Fourth Amendment jurisprudence to the effect that the police are free to do what *some* individual has been authorized to do.").

This view is most cogent because it does not misread *Greenwood* and most accurately reflects other Supreme Court authority, namely *Dunn*.

For one thing, *Greenwood* is simply not about trash located in the curtilage. As noted in the opening paragraph of the opinion, the question in that case was "whether the Fourth Amendment prohibits the warrantless search and seizure of garbage left for collection *outside the curtilage* of a home." *Greenwood*, 486 U.S. at 37, 108 S.Ct. 1625 (emphasis added). Obviously, the Supreme Court made the effort to clarify that *Greenwood* was *not* a curtilage case.

The Supreme Court in that case articulated a rule for whether a protected interest exists in garbage that is not within the curtilage. Indeed, later in the opinion, the Court appeared to equate the public accessibility of garbage with being outside the curtilage.

For example, the opinion noted in one sentence the rule "that society would not accept as reasonable respondents' claim to an expectation of privacy in trash left for collection in an area accessible to the public," *id.* at 41, 108 S.Ct. 1625, and in the very next sentence stated "that 'the overwhelming weight of authority rejects the proposition that a reasonable expectation of privacy exists with respect to trash discarded *outside the home and the curtilege* [sic] thereof,' " *id.* at 42, 108 S.Ct. 1625 (quoting *United States v. Thornton*, 746 F.2d 39, 49 (D.C.Cir.1984)) (emphasis added, notation of misspelling in original).[4]

---

4. The dissents in *Redmon* recognized this idea and suggested that *Greenwood* simply articulated a different test for the outer limit of the curtilage. Though not explicitly stating it, this is necessarily what Judge Posner implied when he observed that trash left outside the curtilage is searchable at-will. *United States v. Redmon*, 138 F.3d 1109, 1131 (7th Cir. 1998) (Posner, J., dissenting). Judge Rovner addressed the idea more explicitly when she noted that the *Redmon* "majority may actually be holding, albeit obliquely, that Redmon's cans were outside his home's curtilage, for its opinion references the four factors the Supreme Court directed us to consider in resolving that question before abruptly declaring that 'our decision in *Redmon* passes all the tests.' " *Id.* at 1135 (Rovner, J., dissenting)

The opinion thus says nothing about the scope of protection *within* the curtilage,[5] but rather goes to some pains to indicate that trash outside the curtilage is different from trash within it.

Most likely this is because the Supreme Court has included the area surrounding the house within the same Fourth Amendment protection as is afforded to the house in another line of cases, which must be additionally considered in warrantless search cases, most notably *Dunn*.

### b. The house and its curtilage

The curtilage of the home, as distinguished from open fields, has always been accorded Fourth Amendment protection from warrantless invasions. *See Hester v. United States*, 265 U.S. 57, 59, 44 S.Ct. 445, 68 L.Ed. 898 (1924) (noting the protection "is as old as the common law" and citing Blackstone); *see also United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). Indeed, the Supreme Court has specifically held that "the Fourth Amendment protects the curtilage of a house," and that "the area . . . should be treated as the home itself" for Fourth Amendment purposes. *Dunn*, 480 U.S. at 300, 107 S.Ct. 1134. Likewise, this Court has stated: "The concept of curtilage began in common law, extending the same protection afforded the inside of one's home to the area immediately surrounding the dwelling." *Quintana*, 276 S.W.3d at 757.

This Court concludes that *Greenwood*, clearly applicable when garbage or trash has been placed for collection outside the curtilage, is not the appropriate standard when the searched trash is inside the curtilage. That remains the test set forth in *Dunn* and *Quintana*, which gives Fourth Amendment protection to anything within the curtilage of the home, absent one of the enumerated exceptions such as plain view.

### *2. Ousley's trash cans were located inside his curtilage and thus were protected from warrantless searches.*

■ The question this Court must resolve is whether the garbage was, in fact, within the curtilage. If Ousley's trash cans were within his curtilage, then they were entitled to Fourth Amendment protection.

■ We reiterate that while the trial court's determination of where the trash cans were located is essentially binding on us, its related legal determination (that the cans were not within the curtilage) is not. Whether a given location was curtilage is reviewed *de novo* on appeal. *See Jones*, 217 S.W.3d at 193; *Ornelas*, 517 U.S. at 697, 116 S.Ct. 1657.

■ The U.S. Supreme Court has articulated a *non-exclusive* list of four factors to consider in deciding whether an area of property is within the curtilage of the home. *Dunn*, 480 U.S. at 301, 107 S.Ct. 1134. Those factors are (1) whether the area is included in an enclosure with the home, (2) whether the resident has taken steps to prevent observation from the peo-

---

(citing *United States v. Dunn*, 480 U.S. 294, 301, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), which lays out those factors) (citation omitted).

**5.** Other courts have recognized this. *See United States v. Certain Real Property Located at 987 Fisher Road, Grosse Pointe, Mich.*, 719 F.Supp. 1396 (E.D.Mich.1989) ("While the United States Supreme Court has recently ruled that the Fourth Amendment to the United States Constitution does not prohibit the warrantless search and seizure of garbage left for collection outside the curtilage of a home, *California v. Greenwood*, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), the Court has not specifically addressed the instant issue.").

ple passing by, (3) how the area is used, and (4) the proximity of the area to the home. *Id.*

The factors are not a "finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions," but instead are merely "useful analytical tools . . . to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

In *Dunn,* the Supreme Court happened to use these factors to find that a barn located approximately 180 feet from the defendant's home, outside the fence surrounding his house, and used for activities related to manufacturing drugs, was not within the curtilage. *Id.* at 302–03, 107 S.Ct. 1134. While Ousley's facts differ substantially, the *Dunn* factors, as well as a common sense understanding of what a reasonable person would expect with regard to the property immediately adjacent to his house, establishes that the trash was within the curtilage of Ousley's home.

Under the first factor, we obviously cannot say that the area in question was enclosed by a fence. But the area invaded by the police in particular is relevant with or without a fence. The home was in an urban area that does not lend itself to enclosures, and the trash cans were actually sitting on the driveway very near the home. While, as *Dunn* noted, enclosures are useful in the curtilage analysis because they "serve[ ] to demark a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house," *id.* at 302, 107 S.Ct. 1134, obviously hot all houses have fences, nor are they required for a house to have curtilage.

Fencing is obviously unnecessary to show "whether the area in question is so intimately tied to the home itself", or the scope of curtilage. Here the trash cans were only a few feet from the front edge of the house itself. Simply comparing the area in this case to the barn in *Dunn,* it is clear that Ousley's trash cans were in an area that was "part and parcel of the house," while the barn clearly wasn't.

That a person has failed to surround his property with a fence (for example, because the lot on which his home sits is small) cannot deprive him of having curtilage surrounding his home, especially when the area in question is so very close to the house itself. "The curtilage would rarely extend beyond the house itself if complete, opaque enclosure were required. Few people, other than the very wealthy, barricade their front yard so completely that a person seeking to enter must request the unlocking of a solid gate that is higher than eye level." *Redmon,* 138 F.3d at 1130 (Posner, J., dissenting).

The second factor—whether the resident has taken steps to prevent observation—is answered here by the fact that the trash was in a closed container. (This fact has generated much discussion on the Court; while it is another line of analysis, it does not stand alone, and cannot be conclusive without looking at where the container is, which makes it part of the curtilage analysis.) Without opening the trash cans, it was impossible to tell if there was any trash to pull. The area where the trash cans sat could be viewed from the street if a vehicle was not in the driveway. But on one of the trash pulls, there was a vehicle in the driveway. And, though the trash cans were visible, the trash was not—it was inside a closed container. The contraband was not left out for observation.

The third factor, how the area is used, also supports a finding that the area was

curtilage. Ousley used the area for home storage, staging yard work, and parking his car. In comparison, the barn in *Dunn* was used for unloading and storing a chemical used in drug manufacturing, not usually a part of daily living. The officers could smell the chemical and heard a loud pump running. The plain smell and hearing doctrines were factors. Based on this, the Court stated, "When considered together, the above facts indicated to the officers that the use to which the barn was being put could not fairly be characterized as so associated with the activities and privacies of domestic life that the officers should have deemed the barn as part of respondent's home." *Dunn*, 480 U.S. at 303, 107 S.Ct. 1134.

But the activities Ousley used the area for in this case were quintessential "activities ... of domestic life." *Id.* That the activities were not associated with the kitchen, bathroom or the bedroom does not mean they were not the sort of intimate activities contemplated by *Dunn*. If that were the limit, then no curtilage would exist, save for an outhouse or an outdoor barbecue. *Dunn* was concerned with "the area around the home to which the activity of home life extends." *Id.* at 302, 107 S.Ct. 1134. There is no doubt that Ousley used the area where his trash cans were found for such activity.

But perhaps the most important factor in this case is the proximity to the home of the trash cans. As the trial court found, they were even with the front of Ousley's home and no farther away than the far side of his narrow driveway. The trial court described them as a "very short distance" from the home and "pretty close." Moreover, Ousley's home was a townhouse on a relatively small lot. The closer one gets to the structure of the house, the more likely one is proceeding into the curtilage. Even the officer said

the trash cans were 20–25 feet away from the curb where other trash had been placed for pick up.

The visual image of other trash cans sitting on the curb for pick up while Ousley's remained level with the front of his house away from the street is a strong contrast that would lead a reasonable person to perceive the trash cans as still being a part of the area where private living occurred.

■ Our own cases state that curtilage "extend[s] the same protection afforded the inside of one's home *to the area immediately surrounding the dwelling.*" *Quintana*, 276 S.W.3d at 757 (emphasis added). If anything, then, in the urban setting, a larger percentage of private property is curtilage than in rural areas because there is generally a limited amount of land surrounding the house. To commandeer Judge Posner's language: "If this spot was not within [Ousley's] curtilage—if it is to be classified as an 'open field'—then no place outside his house was within the curtilage, and, indeed, attached houses, row houses, and other cramped urban dwellings have no curtilage (beyond the house itself); curtilage is confined to farmers and to wealthy suburbanites and exurbanites." *Redmon*, 138 F.3d at 1132 (Posner, J., dissenting). Surely, this dichotomy in Fourth Amendment protection cannot be the justified.

As the Supreme Court has stated, "for most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage—as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience." *Oliver*, 466 U.S. at 182 n. 12, 104 S.Ct. 1735. The area of Ousley's single-car driveway even with the front of his house and near his storage shed was an area to which the activity of his home life extended.

There is no question that it was "an adjunct of the house." *Dunn*, 480 U.S. at 302, 107 S.Ct. 1134.

Thus, based on the officer's testimony that the trash cans were level with the front of the house and the trial court's finding that this was where the trash cans were, this Court concludes that the trash cans were located within the curtilage of Ousley's home and were therefore protected by the Fourth Amendment.

**3. While "invadable," the curtilage of the home may be entered without a warrant only for legitimate contact with the resident.**

Of course, the curtilage of the house is not unassailable. This Court held in *Quintana v. Commonwealth*, 276 S.W.3d 753 (Ky.2008), that police may enter the curtilage of the house in limited circumstances without violating the Fourth Amendment. Specifically, the Court held that police may walk upon the publicly accessible portions of a person's property and proceed to the front door to attempt to speak with the residents. "Essentially, the approach to the main entrance of a residence is properly 'invadable' curtilage ... because it is an area that is open to the public." *Id.* at 758.

■ The Commonwealth argues that the detective simply entered the "invadable" portions of the curtilage, as a person proceeding to Ousley's front door would have to walk up his driveway near the trash cans. But this is an overbroad reading of *Quintana*. The police may invade the curtilage without a warrant only to the extent that the public may do so. And the public may not do so without reasonable limitations.

■ The notion of the curtilage being "invadable" subsumes as a matter of common sense that there is a reason for having access to the homeowner, not to the

property alone. It also reasonably depends on the time of day of the invasion. As applied to this case, the officer's intentional avoidance of contact with the residents of the house, along with a combination of the location and *time* of the search, leads to the conclusion that the detective was not legally on the property under *Quintana*. The search therefore cannot be saved from a Fourth Amendment violation by the doctrine that allows knock-and-talks.

■ Law enforcement's right to invade the curtilage without a warrant must be related to actually engaging with the occupants of the residence, just as the public's right of access turns on the intent to engage in ordinary business with the occupants. Thus, the police do not violate the Fourth Amendment when they "utilize normal means of access to and egress from the house, for some legitimate purpose, such as to make inquiries of the occupant or to introduce an undercover agent into the activities occurring there." *Quintana*, 276 S.W.3d at 758 (quoting Wayne R. La-Fave, *Search and Seizure: Looking at or Listening at the Residence* § 2.3(c) (4th ed.2007)).

■ And just as a private salesperson—absent no-solicitation signs, no-trespass signs, etc.—has implicit permission to approach the house to conduct business with the inhabitants, so too do the police. But just as the salesperson must actually engage or attempt to engage the house, or else be seen as a trespasser, snoop, or peeping torn, so too must the officers actually try to contact the residents, whereupon they may "see or hear or smell from that vantage point." *Id.*

Indeed, none of the cases discussing curtilage describe a public right of access through the curtilage that does not involve interaction with, or the benefit or conven-

ience of, the homeowner. Instead, these cases suggest that the police *must* attempt to contact the resident of the home upon entering the curtilage to avoid violating the Fourth Amendment.

As the Ninth Circuit has said: "To be clear, it remains permissible for officers to approach a home to contact the inhabitants. *The constitutionality of such entries into the curtilage hinges on whether the officer's actions are consistent with an attempt to initiate consensual contact with the occupants of the home.*" *United States v. Perea–Rey,* 680 F.3d 1179, 1187–88 (9th Cir.2012) (emphasis added). The officer in *this case* never tried to contact Ousley or other residents of the house; indeed, the officer's chosen approach to investigating—a covert trash pull—depended entirely on *not* encountering the residents.

 *Quintana* itself reflects this requirement when it notes that "the basic rule is that *police with legitimate business* may enter the areas of the curtilage which are impliedly open to use by the public." *Quintana,* 276 S.W.3d at 758 (internal quotation marks omitted, emphasis added). Where the officer seeks only to search and does not interact with the resident, he has no "legitimate" purpose as understood in the knock-and-talk cases, and thus he steps outside *Quintana* and onto the Fourth Amendment.

 This rule must also apply to trash pulls and other invasions of the curtilage. The police officer searching trash within any area of the curtilage does not do so for the benefit of or to have access to the homeowner. By not trying to contact the home owners, such an officer violates the curtilage in an impermissible way.

 The detective in this case never intended to go to the front door and engage in such business with Ousley. Instead, he went directly to the trash cans under cover of darkness to search them. His goal was not engaging with the homeowner as the public is allowed to do, but to approach the house under cover and to avoid detection, thereby avoiding interacting with Ousley at all. As Professor La-Fave has noted, the "police have only limited authority to come onto the curtilage, for they must conduct themselves as would an ordinary social visitor to the premises. *That hardly includes rummaging through the garbage cans of one's host.*" LaFave, *supra,* § 2.6 (emphasis added); *see also Certain Real Property Located at 987 Fisher Road,* 719 F.Supp. 1396, 1405 (E.D.Mich.1989).

Additionally, the time of day of the invasion matters. Surely there is no reasonable basis for consent to ordinary public access, presumed or otherwise, for the public to enter one's property at midnight absent business with the homeowner. Girl Scouts, pollsters, mail carriers, door-to-door salesmen just do not knock on one's door at midnight; and if they do, they are more likely to be met by an enraged (and possibly armed) resident than one with a welcoming smile.

Though it has not been addressed explicitly, this time limitation nevertheless appears in several of the curtilage cases. One of the earliest knock-and-talk cases laid out the rule like this:

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, *at high noon,* to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law.

*Davis v. United States,* 327 F.2d 301, 303 (9th Cir.1964), *impliedly overruled on other grounds as suggested in United States v. Perea–Rey,* 680 F.3d 1179, 1187 (9th Cir.2012) (emphasis added).

As *Davis* went on to note, "The time of day, coupled with the openness of the officers' approach to defendant's doorway, rules out the possible dangers to their persons which might have resulted from a similar unannounced call in the dead of night." *Id.* at 304. Numerous other cases mention time of the invasion as a factor in whether the Fourth Amendment is violated.

One such case, *State v. Ross,* 141 Wash.2d 304, 4 P.3d 130, 136 (2000), specifically addressed a late night entrance strikingly similar to the facts of this case: "The deputies entered the property at 12:10 a.m., an hour when no reasonably respectful citizen would be welcome absent actual invitation or an emergency. They had no intention of contacting the Defendant. From the facts presented here we can only conclude that the deputies were not conducting legitimate business when they returned to the Defendant's property at 12:10 a.m. and were, therefore, not lawfully on the property. We conclude that the evidence gathered during the 12:10 a.m. entry must be suppressed."

▮ Thus, just as the police may invade the curtilage without a warrant only to the extent that the public may do so, they may also invade the curtilage only *when* the public may do so. Absent an emergency, such as the need to use a phone to dial 911, no reasonable person would expect the public at his door at the times the police searched Ousley's trash.

**4. Effects within the curtilage are protected, and not subject to abandonment analysis.**

Some have argued that a person never has a reasonable expectation of privacy in trash, regardless of whether it is located inside or outside the curtilage, due to the mere fact that it is placed in a trash container and thus is unlikely to be retrieved in the future. This is the so-called abandonment theory. But within the home and its curtilage there is simply a right to privacy, and the reasonableness of that right has never been an issue, subject only to the noted exceptions to warrantless searches.

Also, that the trash has been "disposed of" in a very technical sense, however, cannot be dispositive. *See* LaFave, *supra,* § 2.6 (describing the notion that trash is "abandoned" and never protected as "broad and unsound concept" unsupported by *Greenwood* ). If that were the case, then the police could enter a person's home without a warrant and take the contents of the kitchen garbage can, since trash is trash.[6]

But such searches are clearly unconstitutional. *See, e.g., United States v. Kramer,* 711 F.2d 789, 793 (7th Cir.1983) ("We do not doubt, for example, that had the police broken into defendant's house and removed the records from a waste paper basket in defendant's bedroom, the records would not be admissible as evidence against him, even if all that was in the waste-paper basket was garbage."); *United States v. Biondich,* 652 F.2d 743, 745 (8th Cir.1981) ("A person ordinarily retains some expectation of privacy in items that

---

**6.** Judge Posner saw the absurdity of such a claim in *Redmon* and thus he noted: "But that answer must be wrong, as it would entitle the police to enter the home itself and rifle the trash cans and wastepaper baskets found

there, supposing they could do this without committing a breach of the peace (as they could by pretending to be servicemen of one sort or another)." *Redmon,* 138 F.3d at 1129 (Posner, J., dissenting) (citations omitted).

remain on his or her property, regardless of whether they are placed in an automobile, a home, or *a garbage can.*" (emphasis added)).

### 5. Policy considerations in not allowing trash pulls in the curtilage.

There is also a policy consideration in not permitting undue invasions of the curtilage. That a homeowner might lawfully act to protect himself and his home against a perceived invader of his property is especially troubling in a case like this. Kentucky recognizes a strong "castle doctrine" that not only allows a person to use self-defense to repel an invasion of his home, *see* KRS 503.055, but also to protect property, *see* KRS 503.080. The latter statute goes so far as to allow the use of deadly physical force when the defendant believes it necessary to prevent the occurrence of any of a list of crimes, some of which are serious (criminal trespass, robbery, burglary) and some of which are not so serious (theft, criminal mischief, or any trespassory taking of tangible, movable property). KRS 503.080(1). The only qualification is that the defendant has to believe the person is attempting to dispossess him of his dwelling or is committing or attempting to commit arson, burglary, robbery, or other felony involving the use of force. KRS 503.080(2).

### 6. Curtilage is the appropriate analysis, not whether the trash was in a closed container, standing alone.

While it is always tempting to look for the simplest way of resolving a case, simple is not always better or even accurate in the law. Though not raised below, this Court has considered whether this case must resort to the locality analysis inherent in curtilage cases, or if it can be resolved as a closed container case. The trial court found that the trash was enclosed in trash cans. And, as previously pointed out, unless one looked in the cans, there was no way of knowing whether trash was present.

While the fact that the containers were closed supports the idea that the officer illegally violated the curtilage because the contraband was not in plain view, it does not supplant the constitutional curtilage analysis. Such an approach would ignore the binding precedent that requires looking first at the *location* of a container to determine whether there is a privacy interest at all. The Supreme Court in *Greenwood* was careful to point out that the trash under consideration, while enclosed in opaque trash bags, *was not in the curtilage.* Notably, the search of a closed container was allowed.

There simply is not one rule when it comes to warrantless searches of closed containers. Whether a closed container presents *any* expectation of privacy is wholly dependent on several factors, such as whose container it is, how close it is to the owner, if it is dangerous, if it is in a motor vehicle, if the search is for officer safety incident to an arrest, etc.

For example, *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), allowed the search of a *closed container* because of its location (it was in a car being searched). *Ross* specifically stated that the protection afforded "to the owner of every container that conceals its contents from plain view ... by the [Fourth] Amendment *varies in different settings.*" *Id.* at 822–23, 102 S.Ct. 2157 (emphasis added).

In *California v. Acevedo,* 500 U.S. 565, 575, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991), the Supreme Court noted that "the police often will be able to search containers without a warrant," and offered the example of "a search incident to a lawful arrest," *id.,* which, of course, turns on whether it is within easy reach of the

arrestee. The police do not even need probable cause to search a container in such instances. *Id.* As *Acevedo* recently made clear, the protection for containers depends on the container being one "which can support a reasonable expectation of privacy," which turns, at least in part, on the location of the container.

The evolution of recent Supreme Court Fourth Amendment jurisprudence makes clear that the *location* of a closed container is always a factor that must be considered. Indeed, this is the rationale of *Greenwood.* The Court found no Fourth Amendment protection specifically because of the location of the container: "society would not accept as reasonable respondents' claim to an expectation of privacy in trash left for collection *in an area* accessible to the public. . . ." *Greenwood,* 486 U.S. at 41, 108 S.Ct. 1625 (emphasis added); *see also id.* at 40, 108 S.Ct. 1625 (discussing the importance of the fact that the bags were on or at the side of the street, a location that was "readily accessible to animals, children, scavengers, snoops, and other members of the public" (citation and footnotes omitted)).

■ When faced with the question of "what protection it [the Fourth Amendment] affords . . . [g]enerally . . . the answer to that question requires reference to a 'place.' " *Katz,* 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring). But, while the U.S. Supreme Court has recently backed away from the *Katz* conception of "reasonable expectation of privacy' " as the exclusive Fourth Amendment test, it has again emphasized that *location* matters in Fourth Amendment analysis. *See generally United States v. Jones,* — U.S. ——, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012).

■ In this case, as with all Fourth Amendment warrantless searches, we are obligated to first ask where the item to be searched was located before evaluating the nature of that item. Here, this means that we must first decide whether the trash cans were in the curtilage of the house, not whether they were closed or open. Having concluded that the trash cans were indeed in the curtilage of Ousley's home and the police improperly invaded it, no more analysis is needed. It makes no difference whether they were open or closed unless plain view applies. The warrantless search of those trash cans violated Ousley's Fourth Amendment rights.

■ Finally, applying the curtilage rule does not work a substantial hardship on the police. Indeed, they do not need to do an involved curtilage analysis; they need only wait for the trash to be placed for pick-up. But if they do covertly enter property to do a trash pull, they must determine that the trash cans are not in a protected area of the home. There is little logic to support such impatience, and protected privacy interests may be unduly invaded otherwise, thereby risking that any evidence obtained will be suppressed.

### III. Conclusion

Because the officer retrieved Ousley's trash from his curtilage, the search violated Ousley's Fourth Amendment and Section 10 rights, and he was entitled to have the evidence obtained suppressed. For that reason, the Court of Appeals is affirmed.

MINTON, C.J.; ABRAMSON, CUNNINGHAM, SCOTT and VENTERS, JJ., sitting. MINTON, C.J.; ABRAMSON and SCOTT, JJ., concur. CUNNINGHAM, J., concurs in result by separate opinion in which VENTERS, J., joins. VENTERS, J., also concurs in result by separate opinion in which CUNNINGHAM, J., joins.

CUNNINGHAM, J., Concurring in Result:

I applaud the thorough scholarship and excellent writing of Justice Noble. I also agree with the result the majority reaches. However, I part ways with the reasoning.

With all due respect, and in my humble opinion, this is not a curtilage issue. It is a container issue.

Trash cans, when all is said and done, are simply containers. *California v. Greenwood*, 486 U.S. 35, 50, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988) (Brennan, J., dissenting). They are entitled to no less Fourth Amendment and Section 10 protection than a suitcase, or a wedding gift, or a shoe box. *See Robbins v. California*, 453 U.S. 420, 427, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981) (overruled on other grounds by *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)) (stating that, within the meaning of the Fourth Amendment, "[N]o court, no constable, no citizen, can sensibly be asked to distinguish the relative 'privacy interests' in a closed suitcase, briefcase, portfolio, duffel bag, or box.") "[A] constitutional distinction between "worthy" and "unworthy" containers would be improper." *Ross*, 456 U.S. at 822, 102 S.Ct. 2157. If the identity of the owner is known, there is an expectation of privacy to its contents. *See Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (stating that governmental search and seizure of another's property absent a warrant is presumptively unreasonable). This is true whether the container is in one's bedroom, sitting in the kitchen, out in the middle of the yard, or even outside the curtilage.

In those cases, there must be a warrant to search or probable cause and exigent circumstances. *See United States v. Jacobsen*, 466 U.S. 109, 120, n. 17, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) ("A container which can support a reasonable expecta-tion of privacy may not be searched, even on probable cause, without a warrant.") None were present in this case. So, trash cans are protected.

Unless.

Unless the contents are abandoned.

Then there is no Fourth Amendment or Section 10 standing to question the search. *See Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); *King v. Commonwealth*, 374 S.W.3d 281, 286–87 (Ky.2012).

In my opinion, trash is not abandoned until it is placed in the stream of the public trash pickup service. *See United States v. Dela Espriella*, 781 F.2d 1432, 1437 (9th Cir.1986) (holding that placing garbage for collection constitutes abandonment of property); *United States v. Terry*, 702 F.2d 299, 308–09 (2d Cir.1983) (finding that placing trash out for collection is an act of abandonment); *United States v. Reicherter*, 647 F.2d 397, 399 (3d Cir.1981) ("[T]he placing of trash in garbage cans at a time and place for anticipated collection by public employees for hauling to a public dump signifies abandonment."); *United States v. Vahalik*, 606 F.2d 99, 101 (5th Cir.1979) ("[T]he act of placing garbage for collection is an act of abandonment which terminates any [F]ourth [A]mendment protection."); *United States v. Shelby*, 573 F.2d 971, 974 (7th Cir.1978) ("[T]he placing of trash in the garbage cans at the time and place for anticipated collection by public employees for hauling to a public dump signifies abandonment.").

"It is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public." *See California v. Greenwood*, 486 U.S. at 40, 108 S.Ct. 1625. When it is placed at the location of pickup, the owner is proclaiming to

all the world that "I'm through with this stuff; come and get it." Until then, the owner maintains control over it and may move it around to different places, take matter out of the garbage, or add rubbish thereto. In most instances, it will be either at the curb or in the dumpster. It conceivably could be other places, even within the curtilage.

It can become very confusing when we try to analyze "trash pull" cases on the curtilage analysis. The majority, writing through Justice Noble, admits this. "Whether the two trash pulls were illegal is a deceptively complex question." As the very thorough analysis of the majority indicates, the courts of the land are all over the boards on the curtilage issue.

It seems unfair to me to expect our policemen on the streets to understand these subtle legal nuances and apply the slippery four point analysis of *Dunn.*

I take no issue with the majority statement that location is an important consideration as to the expectation of privacy. But even the curtilage analysis is not conclusive to whether the container has Fourth Amendment protection. There are containers which may be found inside the curtilage which are not protected. Dumpsters and items displayed for yard sales are just two examples. At the same time, there may be containers outside the curtilage which are protected. An identified piece of luggage left at the curb by someone who had just exited a cab at a hotel would be just one of many examples. *See State v. Kealey,* 80 Wash.App. 162, 907 P.2d 319, 326 (1995); *see also State v. Ching,* 67 Haw. 107, 678 P.2d 1088, 1092–93 (1984) (controlled substances found in a closed brass cylinder were properly suppressed because the cylinder was inside an unzipped leather pouch, police found owner's identification before opening the cylinder, and the defendant retained an expec-

tation of privacy in cylinder's contents); *State v. May,* 608 A.2d 772, 776 (Me.1992) (controlled substances found in defendant's misplaced wallet suppressed because the searching officer knew to whom the wallet belonged and was not searching it for purposes of identification).

"Trash pull" investigations are a nasty business for our law enforcement officers. They are also dangerous. The trash can on one of the "pulls" in this case was being foraged at 12:30 in the morning only 12 feet from the Appellee's door. A person can get shot that way. That is why a bright line rule is necessary to protect the rights of individuals and the safety of our law enforcement officers as well.

The curtilage analysis by Justice Noble in this case is, typically, flawless. However, I would suggest that it is unnecessary to go there when dealing strictly with trash. In doing so, I fear we fail to give our law enforcement people clear and concise guidance.

Therefore, I concur in result only of the majority opinion.

VENTERS, J., joins.

VENTERS, J., Concurring in Result:

I agree with Justice Cunningham that the search of a closed container whether it is a trash can or a suitcase, located on a residential lot requires a search warrant, except perhaps when exigent circumstances exist. I would also submit that when the property involved is a small yard in a residential lot, we should discard altogether the antiquated concept of "curtilage." Historically, the curtilage of a property was the area around the residence that enveloped the outdoor privy, the well, the smokehouse, the woodshed, the carriage house, the herb garden, and other essential elements of the household. What was not "within the curtilage" was

part of the "open fields." There are modern remnants of such household elements; for example, a garage, a tool shed, or a child's playhouse. But on the small lot of a typical residential subdivision, that vestige of the curtilage is the whole yard. There is no discernible distinction between the curtilage and the open fields. It is all curtilage, and the expectation of privacy extends to the whole yard of the small residential lot.

CUNNINGHAM, J., joins.