**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Noel C. JENKINS (96–5338); Linda L. Jenkins (96–5346), Defendants–Appellants.**

**Nos. 96–5338, 96–5346.**

United States Court of Appeals, Sixth Circuit.

Argued April 24, 1997.

Decided Sept. 3, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied Nov. 17, 1997.

and I express no opinion on that issue.

Terry M. Cushing, (briefed), Asst. U.S. Attorney, William F. Campbell, (argued), Asst. U.S. Attorney, Mark L. Miller, (briefed), Asst. U.S. Attorney, Office of the U.S. Attorney, Louisville, KY, for Plaintiff–Appellee.

Timothy J. Gillenwater, (argued and briefed), Temple Dickinson, (briefed), Gillenwater, Hampton & Dickinson, Glasgow, KY, for Defendants–Appellants.

Before: KEITH, BATCHELDER, and DAUGHTREY, Circuit Judges.

BATCHELDER, Circuit Judge.

In July 1992, members of the Governor's Marijuana Strike/Task Force of Kentucky seized approximately 862 marijuana plants and other incriminating evidence from the rural property of defendants Noel and Linda Jenkins. A jury subsequently convicted defendants of conspiring to manufacture marijuana, manufacturing marijuana, and possessing marijuana with intent to distribute, in violation of 21 U.S.C. §§ 841 and 846. The jury also forfeited Noel Jenkins's interest in

the property. Defendants appeal their convictions and sentences. Noel Jenkins also appeals the forfeiture of his interest in the property. For the following reasons, we **AFFIRM**.

## I. BACKGROUND

On July 23, 1992, Sargent Ron West, a twenty-eight year veteran of the Kentucky State Police, directed members of the Governor's Marijuana Strike/Task Force to perform an aerial inspection for marijuana in the southwest portion of Monroe County, Kentucky. West ordered the inspection because he had previously received information that defendants were cultivating marijuana in that locality. Consistent with this information, the helicopter crew observed marijuana growing in a wooded field located directly behind defendants' residence.

Defendants live on a multi-acre plot of farmland, some of which is heavily wooded. This land lies on both sides of a public road; defendants' house is on one side of the road, set well back from it. A wire fence separates defendants' house and yard from the remainder of the property on that side of the road. A gravel driveway leads from the road to a "car-port" located on one side of the house. Defendants' backyard, much of which is shielded from the road by the house, consists of a neatly trimmed lawn, numerous small trees and flower arrangements, and a shed. Behind the backyard is a wooded field, accessible from the backyard through a gate.

Based on the aerial observations, West decided to perform a ground search of defendants' property, although he had not obtained a search warrant. Upon arrival at the property, West and his "team," which consisted of two Kentucky National Guard oversized jeep-like vehicles ("humvees") manned by ten to fifteen Kentucky State Police troopers and National Guardsmen, observed Linda Jenkins standing in the backyard outside her home. West introduced himself, advised Linda that marijuana was growing on her property, and asked her how his team could best access the wooded field behind her house. Linda told West to drive down the

road towards a barn and enter through a gate located in that general vicinity. Linda then left the premises.

Instead of following Linda Jenkins's directions, West and his team parked the humvees in defendants' driveway and members of the team began wandering around defendants' backyard, where they discovered the gate leading into the wooded field. Various team members and at least one humvee used this gate to access the wooded field. West searched defendants' backyard before entering the field. He noticed a can of green spray paint and containers of hog-rings, hog-ring pliers, and tin snips lying near the shed. He also observed an empty naphthalene mothball box in a bucket that was resting against the back of defendants' house.

Proceeding into the field, West discovered a flotation growing device located approximately 85 feet behind the wire fence that separated defendants' backyard from the wooded field and 238 feet from defendants' house.[1] The device contained 570 "young" marijuana plants growing in styrofoam trays. The growing device was surrounded by a loosely-run strand of poultry wire and was covered by three wooden boards and green-painted utility wire. This cover, however, did not obstruct West's view into the device. Two connected hoses formed a water line leading from the flotation device to the wire fence enclosing defendants' backyard. West seized the marijuana, the wire cover, and the hoses.

Other team members discovered patches of marijuana growing in the woods approximately 100 feet behind defendants' backyard and just inside the woods across the road from defendants' house. Like the growing device, the patches were surrounded by poultry wire, some of which was hog-ringed together. A number of the patches contained naphthalene mothballs. The team seized the marijuana and the poultry wire. A further search of the woods behind defendants' house revealed an old refrigerator containing styrofoam cups full of plant food and a plastic camouflage tarpaulin. Only the tarpaulin was seized.

---

1. The flotation growing device was visible from defendants' backyard.

Realizing that "this was a pretty good sized case," West suspended the search until one of the team members could obtain a video-camera. The search did not resume for approximately two hours, at which point West again searched defendants' backyard. He noticed a hose coiled up next to a faucet attached to defendants' house, and uncoiled it to see if it would reach the back fence, where the hoses from the growing device led. It did. West recoiled the hose and placed it back were he found it. He then seized the can of green spray paint, the hog-rings and hog-ring pliers, and the tin snips that were located near the shed, along with the empty mothball box from the bucket next to defendants' house.

Eventually, Noel Jenkins, who apparently had been away from home during the search, returned home and went into his house. West knocked on the door, stepped inside the foyer, and called to him. When Noel answered, West stepped back outside and waited for Noel to come out of the house. Informing Noel that the team had found marijuana growing in the field behind his house, West advised Noel of his rights, but explained that he was not under arrest and did not handcuff him. West then asked Noel for permission to search the shed, with the understanding that any incriminating evidence that West found would be used against him. Noel consented to the search, stating that he had nothing to hide. West seized two boxes of naphthalene mothballs, a styrofoam tray, and a light from the shed. West informed Noel that he was free to go and Noel went to his barn and tended to his livestock.

On July 21, 1993, a federal grand jury returned a three-count indictment against defendants, charging them with conspiring to manufacture marijuana, manufacturing marijuana, and possessing marijuana with intent to distribute, in violation of 21 U.S.C. §§ 841 and 846. Defendants moved to suppress the evidence seized from their property. This motion was referred to a magistrate judge, who, after conducting a lengthy suppression hearing, recommended that the motion be denied. The magistrate judge reasoned that the evidence West seized from the shed was admissible because Noel Jenkins freely and voluntarily consented to a search of that area. The magistrate judge concluded that the remaining evidence was admissible because defendants' land, including the backyard, is an open field not entitled to Fourth Amendment protection. *See Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). The magistrate judge rejected defendants' contention that the backyard is part of their home's curtilage. The district court, over defendants' objections, adopted the magistrate judge's recommendation in full.

On August 8, 1995, the grand jury returned a superseding indictment, adding a fourth count seeking criminal forfeiture of defendants' property. Defendants filed additional defensive motions, including another motion to suppress, which the district court denied.

On October 31, 1995, a jury found defendants guilty of counts one through three and forfeited Noel Jenkins's interest in the property. The jury did not, however, forfeit Linda Jenkins's interest. The district court issued a preliminary order of forfeiture of Noel Jenkins's interest in the property and sentenced defendants to sixty months imprisonment on each of the three counts, to be served concurrently. Defendants timely appealed, raising a scatter-shot of issues attacking their convictions and sentences. Noel Jenkins also appeals the forfeiture of his interest in the property. Only one issue, however, merits further discussion—whether the district court erroneously admitted the items seized from defendants' backyard.

## II. DISCUSSION

■ Defendants assert that the district court erred in admitting the items that the team seized from their backyard. Defendants argue that their backyard is part of the "curtilage" of their house, and that West and his team violated the Fourth Amendment when they physically invaded and seized items from that area. We agree.

■ When reviewing the denial of a motion to suppress evidence, we review the district court's findings of fact for clear error

and its conclusions of law *de novo*. *United States v. Williams,* 962 F.2d 1218, 1221 (6th Cir.1992). We must review the evidence " 'in the light most likely to support the district court's decision.' " *Id.* (quoting *United States v. Gomez,* 846 F.2d 557, 560 (9th Cir. 1988)).

■ The Fourth Amendment provides for "people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ... and [that] no Warrants shall issue, but upon probable cause...." U.S. CONST. amend. IV. It is well established that the protection provided by the Fourth Amendment extends to the "curtilage" area of a house. *See United States v. Dunn,* 480 U.S. 294, 300–01, 107 S.Ct. 1134, 1139–40, 94 L.Ed.2d 326 (1987); *Dow Chem. Co. v. United States,* 476 U.S. 227, 235, 106 S.Ct. 1819, 1825, 90 L.Ed.2d 226 (1986); *California v. Ciraolo,* 476 U.S. 207, 212–13, 106 S.Ct. 1809, 1812–13, 90 L.Ed.2d 210 (1986); *Oliver v. United States,* 466 U.S. 170, 178, 180, 182 n. 12, 104 S.Ct. 1735, 1741, 1742, 1743 n. 12, 80 L.Ed.2d 214 (1984). Indeed, the curtilage is considered part of the house itself for Fourth Amendment purposes. *Oliver,* 466 U.S. at 180, 104 S.Ct. at 1742. As we explained in *Dow Chemical Co. v. United States,* 749 F.2d 307, 314 (6th Cir.1984), *aff'd,* 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986), the protection afforded to curtilage

> is grounded in the peculiarly strong concepts of intimacy, personal autonomy and privacy associated with the home. The home is fundamentally a sanctuary, where personal concepts of self and family are forged, where relationships are nurtured and where people normally feel free to express themselves in intimate ways. The potent individual privacy interests that inhere in living within a home expand into the areas that enclose the home as well. The backyard and area immediately surrounding the home are really extensions of the dwelling itself. This is not true simply in a mechanical sense because the areas are geographically proximate. It is true because people have both actual and reasonable expectations that many of the private experiences of home life often occur outside the house. Personal interactions, daily routines and intimate relationships revolve around the entire home place. There are compelling reasons, then, for applying Fourth Amendment protection to the entire dwelling area.

*See also Ciraolo,* 476 U.S. at 212–13, 106 S.Ct. at 1812–13 ("The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened.").

The concept of curtilage, unfortunately, evades precise definition. In *Oliver,* 466 U.S. at 180, 104 S.Ct. at 1742 (quoting *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886)), the Supreme Court explained that at common law curtilage was defined to include those areas "to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.' " Therefore, the federal courts have historically defined curtilage "by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." *Id.* (citations omitted). In *United States v. Dunn,* 480 U.S. 294, 301, 107 S.Ct. 1134, 1139–40, 94 L.Ed.2d 326 (1987), the Court elaborated upon these articulations and explained that curtilage questions should be resolved with reference to four factors: (1) "the proximity of the area claimed to be curtilage to the home"; (2) "whether the area is included within an enclosure surrounding the home"; (3) "the nature of the uses to which the area is put"; and (4) "the steps taken by the resident to protect the area from observation by people passing by." The Court cautioned, however, that it was not announcing a rigid test. "Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

Applying the factors delineated in *Dunn* to defendants' backyard, we conclude that it is within the curtilage of defendants' house.

First, defendants' backyard is in close proximity to their house. The yard is not large and is immediately accessible from a sliding glass door located in the back of the house.

■ The second *Dunn* factor also supports a finding that the backyard is curtilage. Defendants' yard is enclosed on three sides by a wire fence, making it impossible for someone to enter the yard from the fields without using the gate or climbing over the fence. Entry from the remaining side, although not completely barred, is partially obstructed by the house. The fact that the yard and the house lie within the same fenced-off area is particularly significant. *Id.* at 302, 107 S.Ct. at 1140; *see also United States v. Reilly,* 76 F.3d 1271, 1277–78 (2d Cir.) (finding of curtilage where defendant's property was enclosed by three-sided wire fence and woods), *aff'd. on reh'g,* 91 F.3d 331 (2d Cir.1996); *United States v. Swepston,* 987 F.2d 1510, 1515 (10th Cir.1993) (finding of curtilage where "chicken shed" and defendant's house were partially enclosed by wire fence). As the Supreme Court stated in *Oliver,* 466 U.S. at 182 n. 12, 104 S.Ct. at 1743, "for most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage—as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience." Defendants' backyard is clearly demarked as a continuation of the home itself. No one could mistake the yard, and its neatly mowed lawn and garden arrangements, for the unkept open fields composing the remaining portion of defendants' rural property. *See Reilly,* 76 F.3d at 1279 ("The park-like appearance of the area made it readily apparent to observers that the area was private.").

The third *Dunn* factor also weighs in defendants' favor. Defendants used the backyard as an area to garden, planting numerous small trees and flowers. Defendants also used this area for such things as hanging their wet laundry on a clothesline to dry. Such activities are related to the intimate activities normally associated with the home. Although not dispositive, it is certainly worth mentioning that West and his team possessed objective data indicating that the defendants put their backyard to such uses. *See Dunn,* 480 U.S. at 301–02, 107 S.Ct. at

1139–40 (holding that defendant's barn is not curtilage and observing that "[i]t is especially significant that the law enforcement officials possessed objective data indicating that the barn was not being used for intimate activities of the home"). Indeed, as the team entered the backyard, the gardens were in plain view and, according to the Government's brief, defendant Linda Jenkins was "attending to a clothesline" there.

This leaves the fourth *Dunn* factor, the steps defendants took to protect their backyard from observation by passing individuals. Defendants' backyard is a good distance from the road and is located, quite obviously, behind the house. The yard is therefore well shielded from the view of people passing by on the only public thoroughfare near defendants' property. Moreover, the wooded field behind defendants' house helps protect against undesired public viewing of the backyard. It is also important to remember that defendants live in a remote and sparsely populated rural area where they would have had no particular reason to believe that they needed to construct a high impenetrable fence around the backyard in order to ensure their privacy.

Taken together, as they must be, the *Dunn* factors militate in favor of the conclusion that defendants' backyard "is so intimately tied to [their] home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn,* 480 U.S. at 301, 107 S.Ct. at 1140. Defendants had a reasonable expectation that their backyard would remain private and free from physical invasion.

■ We do not mean to suggest that because defendants' backyard is within the curtilage of the house, it receives protection from all police observation. The protection extended to a house by the Fourth Amendment does not require police officers to shield their eyes when passing on a public concourse. *California v. Ciraolo,* 476 U.S. 207, 213, 106 S.Ct. 1809, 1812–13, 90 L.Ed.2d 210 (1986); *see also Florida v. Riley,* 488 U.S. 445, 449–50, 109 S.Ct. 693, 696–97, 102 L.Ed.2d 835 (1989) (plurality opinion). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States,* 389 U.S. 347, 351, 88

S.Ct. 507, 511, 19 L.Ed.2d 576 (1967) (citations omitted). Visual inspection from a lawful vantage point, however, is quite different from the physical assault on defendants' backyard that occurred in this case. *See Riley,* 488 U.S. at 449, 452, 109 S.Ct. at 696, 697 (plurality opinion) (distinguishing lawful visual inspection of curtilage from physical invasion).

■ The government argues that even if defendants' backyard is curtilage, the items seized therefrom are admissible under the "plain view" doctrine. This contention is wholly without merit. Four conditions must be present before police may seize an item pursuant to the plain view doctrine: (1) the item must be in plain view; (2) the item's incriminating nature must be immediately apparent; (3) the item must be viewed by an officer lawfully located in a place from which the object can be seen; and (4) the item must be seized by an officer who has a lawful right of access to the object itself. *Horton v. California,* 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2307–08, 110 L.Ed.2d 112 (1990); *United States v. Calloway,* 116 F.3d 1129, 1133 (6th Cir.1997); *United States v. Roark,* 36 F.3d 14, 18 (6th Cir.1994). West seized a can of green spray paint, an empty naphthalene mothball box, hog-rings, hog-ring pliers, and tin snips from defendants' backyard. Even if we assume that these items were in plain view and that West immediately associated these items with criminal activity, the plain view doctrine does not save this unlawful seizure. West first took notice of these objects when he began searching the backyard, an area we have determined to be part of the curtilage of defendants' house. He first searched the backyard before he ever entered the open fields to perform the lawful search of that area. Therefore, West did not observe these items from an area where he was lawfully entitled to be. Moreover, if we could assume that West did observe the items from a permissible vantage point, he still had to enter defendants' protected curtilage in order to seize them. For these reasons, we hold the plain view doctrine inapplicable. We therefore hold that the district court erred in denying defendants' motion to suppress the items seized from the backyard.

■ Despite the district court's error, defendants' convictions must stand. Given the vast amount of evidence lawfully seized from the open fields and defendants' shed, including approximately 862 marijuana plants and other drug cultivating paraphernalia, and in light of the incriminating testimony elicited at trial, we find the district court's admission of the tainted evidence to be harmless error. *Chapman v. California,* 386 U.S. 18, 23–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967); *United States v. Baro,* 15 F.3d 563, 568 (6th Cir.1994).

Defendants have raised a number of other issues, challenging their convictions, sentences, and the forfeiture of Noel Jenkins's interest in defendants' property. We have carefully considered the record, counsels' arguments, and the applicable law, and have determined these issues to be without merit and deserving of no further discussion.

### III. CONCLUSION

For the preceding reasons, we **AFFIRM** defendants' convictions and sentences, and the forfeiture of Noel Jenkins's interest in defendants' property.