RENDERED: MAY 9, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-1322-MR

COMMONWEALTH OF KENTUCKY          APPELLANT

                    APPEAL FROM PIKE CIRCUIT COURT
v.               HONORABLE HOWARD KEITH HALL, JUDGE
                    ACTION NO. 23-CR-00060

STEVEN CODY ADKINS             APPELLEE

OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE: ACREE, CALDWELL, AND LAMBERT, JUDGES.

LAMBERT, JUDGE: The Commonwealth of Kentucky has appealed from the Pike Circuit Court's October 13, 2023, order granting Steven Cody Adkins's motion to suppress evidence obtained during a warrantless search of his residence after a knock and talk. We reverse and remand.

During the early evening hours of December 14, 2022, Kentucky State Police (KSP) Troopers Braxton Whitmore and Chris Tyree went to Adkins's residence on Wolfpit Creek Road in Elkhorn City to conduct a "knock and talk"

after receiving a citizen tip that he was trafficking in narcotics. The Uniform Citation reflected that after the troopers made contact with him, Adkins gave consent for them to search his residence. During the search, the troopers located narcotics, marijuana, drug paraphernalia, cash, and firearms. The troopers arrested Adkins on drug trafficking and paraphernalia charges later that evening. In January 2023, the Pike County grand jury returned an eight-count indictment, charging Adkins with seven counts of varying degrees of drug trafficking while in possession of a firearm and one count of possession of drug paraphernalia. Adkins entered a not guilty plea at his arraignment, and through discovery the Commonwealth provided counsel for Adkins with the 25-page KSP report, a CD of the grand jury testimony, and a lab report.[1]

In April 2023, Adkins filed a motion pursuant to Kentucky Rules of Criminal Procedure (RCr) 8.27 to suppress all evidence obtained as a result of the knock and talk. He argued that the troopers invaded his curtilage, to which he had restricted public access by fencing the entire front yard, without a search warrant and exceeded the limitations on the scope of a knock and talk, making the search and seizure an unconstitutional violation of his Fourth Amendment rights, citing *Quintana v. Commonwealth*, 276 S.W.3d 753, 759 (Ky. 2008), and *Commonwealth v. Ousley*, 393 S.W.3d 15, 26 (Ky. 2013). .

---

[1] None of this discovery is in the appellate record.

In a supplemental memorandum, Adkins clarified that unlawful knock and talk tactics invalidate consent, if given. And he stated that the officers knocked on the door of his residence after passing no trespassing signs, a fenced yard, and a closed gate. Furthermore, the troopers entered Adkins's back yard and approached the back door of the residence. In addition, Adkins disputed whether his consent was voluntary and suggested that the troopers led him to believe that they had a search warrant.

In its response, the Commonwealth stated that the troopers conducted the knock and talk after coming into contact with an intoxicated female who told them that she had gotten "the stuff" from Adkins at his residence, which she described for them. It argued that the troopers were permitted to approach the main entrance of the residence and that while the residence was fenced, it was not barred, and there was no indication that the fence was locked to prohibit people from entering. The Commonwealth further argued that Adkins's consent to search was lawful and voluntary.

The court held a suppression hearing in July 2023, during which the Commonwealth introduced testimony from Trooper Whitmore. Adkins testified on his own behalf.

Trooper Whitmore testified that he had been working at KSP for two and a half years and was currently assigned to post 9. He had previously been

assigned to Pike County and was working in that capacity on December 14, 2022, when he came into contact with Adkins. KSP received a call reporting that a car was parked behind the caller's (not Adkins's) house with a person sleeping inside of it. He and Trooper Tyree went to render assistance and made contact with the female in the driver's seat. The female was asleep and woke up after he knocked on the window. She got out of her car when asked, and Trooper Whitmore saw drug paraphernalia in her car. The female volunteered that "we get our stuff from a Cody Adkins off Wolfpit." This was the first the troopers heard about Adkins. She described where Adkins lived, including that there was a chain link fence and a red truck in the driveway. The troopers did not arrest the female.

The troopers used the information that the female gave them to go to Adkins's house. Once they arrived, around 5:25pm, Trooper Whitmore saw the two-story house with a chain link fence around it, a blacktop driveway and garage beside it, and several vehicles and various items in the yard, as she had described. At that point, he and Trooper Tyree went to make contact with Adkins. He did not remember if he saw a gate, but they did not have to break any locks to get to the front porch of the house. Trooper Whitmore knocked and announced himself at the front door, the place he said a delivery driver would take a package. He could smell a strong odor of marijuana coming from inside the residence. There was no response to his knock, but he could hear a person walking around inside. At that

-4-

time, Trooper Tyree attempted to knock on the back door so that he could speak with Adkins. But before he could knock, Trooper Tyree saw a man (who was Adkins) voluntarily exit the back door. The troopers made contact with Adkins at that point. Adkins then took the troopers to his garage beside the residence, where they had a conversation. The troopers explained that they were there to simply follow up on some information they had received.

During this conversation, Adkins agreed to permit the troopers to search the inside of his residence. They did not tell him they had a search warrant or that they were not leaving until he consented to the search. If Adkins had denied consent, the troopers would have left. The troopers did not discuss the search any further after Adkins granted his consent, although Trooper Whitmore gave him a chance to change his mind before they entered the residence. Adkins did not change his mind and still gave them permission to search. Adkins told them they would find about 100 Suboxone pills for which he did not have a prescription and "some weed." During the search, the troopers found large amounts of marijuana in the living areas. On a couch, they found a backpack that contained a large amount of different pills in bottles, digital scales, clear baggies, small bags of suspected marijuana, and cartridges of THC marijuana. In the living room, they found baggies of marijuana and paraphernalia on a table and drugs in baggies under the table. Beside the couch in the living room, they also found two

handguns as well as a shotgun and a rifle. Adkins never asked them to stop the search or to get a search warrant. They never threatened him regarding the search. They did not discuss getting a search warrant instead in front of Adkins.

On cross-examination, Trooper Whitmore agreed that he exited the residence at one point and went to his car to make a telephone call. He could not remember what the purpose of the call was, although he said it had nothing to do with the case. He denied that he had called anyone to ask what he should do. He later testified that he used a private phone when he went to his vehicle. He did not call the county attorney or supervisor about what to do. He may have called Trooper Thomas about evidence collection, and what evidence could be collected if Adkins gave consent. Trooper Whitmore denied implying to Adkins that a search warrant was on the way. He admitted that they had gone to the residence to gather evidence of a crime but did not attempt to seek a search warrant. He explained it was because Adkins voluntarily permitted them to search the residence. The troopers went to the residence solely on the suspicion that Adkins had illegal narcotics and hoped they would find something to help prove that, not to assist anyone who lived there or because they were asked to be there. Trooper Whitmore was shown a photograph of the fence and gate on Adkins's property.[2]

_____

[2] This undated photograph is not in the appellate record but was attached to Adkins's brief. It appears to be of a chain link fence with a closed gate facing the side of the house with a cement

He believed he entered through the gate. He did not recall seeing a "beware of dog" or "no trespassing" sign when they approached the property, which possibly would have made a difference. He approached the front door but did not enter it. The other officer confronted Adkins at the back door. Trooper Whitmore maintained that despite knowing what was in the house, Adkins voluntarily let them search.

Adkins testified next. Adkins identified the photograph that depicted the side entrance to his property. He stated there were even more signs up than shown in the photograph when the troopers came to his property; some had been moved to other places. The troopers had to go through those signs. Regarding consent, Adkins told them that his mother owned the house and that he really could not give them consent to go in the house. Regarding a search warrant he "heard there was one on the way" and that the troopers would not leave until they searched the house. Regarding a telephone conversation, he stated that while Trooper Whitmore went to his vehicle to make a call, the other officer stayed with him and said they were getting in the house "no matter what." The troopers never identified the person Trooper Whitmore was calling, but Adkins believed they might have said that he was calling for a warrant.

---

walkway leading to the front of the house. The gate and fence have "no trespassing" and multiple "beware of dog" signs posted on them.

The court asked about the photograph of the property attached to Adkins's motion to suppress, which was different than the picture introduced at the hearing. Adkins's counsel stated that it was not an accurate representation and that he had obtained it from the PVA's office. It included a date of May 2012.[3] The court then indicated it would file the new photograph that had been discussed into evidence for purposes of the hearing.

The court entered its findings of fact, conclusions of law, and order on October 13, 2023, in which, "based upon the evidence presented at the hearing," it granted Adkins's motion and suppressed all evidence that the troopers obtained during their warrantless search of the residence. This appeal by the Commonwealth now follows.

On appeal, the Commonwealth argues that the circuit court erred in granting the motion to suppress as the troopers did not illegally invade Adkins's curtilage and because his consent to search was voluntary. Adkins disputes these claims and argues that this Court should ban the use of the knock and talk without a warrant when a police investigation is focused on a particular subject.

Our standard of review is set forth as follows:

---

[3] This photograph is of a Google Street View taken in May of 2012 showing a two-story house with stairs leading to a front porch surrounded by a yard that is enclosed by a chain link fence. There are two closed gates in the fence visible in the photograph; one faces the front porch of the house, and the other faces the side of the house. Cement walkways lead from both gates to the steps that lead to the front porch/entry area. A mailbox is visible at the corner of the property, just outside of the chain link fence and on a line of cinderblocks that appear to support the fence.

When reviewing a ruling on a suppression motion, an appellate court generally employs a two-step process. First, findings of fact are reviewed and will not be set aside unless they are clearly erroneous. [Kentucky Rules of Civil Procedure (CR)] 52.01; *Simpson v. Commonwealth*, 474 S.W.3d 544, 547 (Ky. 2015). Findings of fact are not clearly erroneous if they are supported by substantial evidence. *Commonwealth v. Deloney*, 20 S.W.3d 471, 473 (Ky. 2000). Substantial evidence is "evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men." *Owens-Corning Fiberglas Corp. v. Golightly*, 976 S.W.2d 409, 414 (Ky. 1998) (citations omitted). Also, due regard is given to the opportunity of the circuit court to judge the credibility of the testifying officer and to assess the reasonableness of the officer's inferences. *Commonwealth v. Whitmore*, 92 S.W.3d 76, 79 (Ky. 2002). Second, the circuit court's application of the law to conclusive facts is reviewed de novo. *Simpson*, 474 S.W.3d at 547.

*Commonwealth v. Perry*, 630 S.W.3d 671, 674 (Ky. 2021) (footnote omitted). "In conducting our review, our proper role is to review findings of fact only for clear error while giving due deference to the inferences drawn from those facts by the trial judge." *Perkins v. Commonwealth*, 237 S.W.3d 215, 218 (Ky. App. 2007) (citing *Whitmore*, 92 S.W.3d at 79).

At the outset, our review of the appellate record establishes that several of the findings of fact the circuit court made and relied upon in reaching its decision were not supported by substantial evidence of record and are therefore clearly erroneous. The erroneous findings are as follows:

- Finding 7: "Only the sound of footsteps and an aroma of marijuana, led the Troopers to leave the front door and walk further behind the property." The testimony (and other proper findings) established that only one trooper – Trooper Tyree – walked to the back of the house once he and Trooper Whitmore heard someone inside after Trooper Whitmore knocked on the front door and they smelled the odor of marijuana.

- Finding 8: "Testimony was that even at this point, the defendant **did not** welcome the officers inside the residence to look around or chat." (Emphasis in original.) There is no testimony that Adkins did not welcome the troopers inside of the house. Rather, the testimony is that Adkins took the troopers to the garage to talk.

- Finding 11: "Testimony was given that the officers asked the defendant more than once to enter the residence, indicating the defendant had initially denied them permission to view the inside of his residence." Trooper Whitmore testified that he gave Adkins a chance to change his mind after he had consented to the search. Adkins never testified that he denied them permission to search. He testified that his mother owned the residence and that he did not know if he could grant consent or not.

- Finding 12: "The defendant testified that . . . the gate is always kept closed; indicating the officer approached his front door by entering a closed gated

fenced property." Adkins did not testify that the gate was always kept closed.

- Finding 14: "The defendant testified that he was not the property owner of the residence [this portion is supported by the record] and told police they would have to speak to the homeowner prior to entering or get a search warrant." Adkins testified that he told the troopers that his mother owned the house and that he really could not give consent to go in the house or not.

- Finding 16: "Testimony was given that a fourth Trooper became involved named Trooper Pierce and he came to the property in a KSU SUV believed to be a Tahoe." There is nothing in the record to support this finding.

- Finding 17: "Testimony was given that the defendant was going out the back door because he could see the officers out his windows walking around his property, and he didn't know why officers were going out back." There is nothing in the record to support this finding.

- Finding 19: "Testimony provided by Trooper Whitmore revealed that there were four Troopers with knowledge of possible drugs at the defendant's house[.]" There is nothing in the record to support this finding.

We recognize that some or all of this information may be included in the discovery that was not included in the record on appeal. However, there is no indication that the discovery materials were filed with the circuit court as the Commonwealth's

compliance notice states that the material was only provided to counsel for Adkins. And the court specifically stated in its ruling that its findings of fact were based upon the evidence presented at the evidentiary hearing, and nothing else.[4]

We shall first consider whether the circuit court erred in concluding that the troopers impermissibly invaded Adkins's curtilage in performing a knock and talk.[5] The court held that because the troopers' sole purpose in invading the curtilage was to gather evidence, they were not there for a legitimate business of the public, citing *Quintana*, *supra*, and *Ousley*, *supra*, and therefore they violated Adkins's Fourth Amendment rights.

In *Quintana*, the Supreme Court of Kentucky held that "the knock and talk procedure is a proper police procedure and may be used to investigate the resident of the property, provided the officer goes only where he has a legal right to be." 276 S.W.3d at 755. The Court explained that this procedure "involves law enforcement officers approaching a home for the purpose of obtaining information

---

[4] However, a reading of the order establishes that the court also relied upon the Uniform Citation, which is in the record, as well as the results of a criminal records search on CourtNet.

[5] We specifically reject Adkins's request that we place an outright ban on the use of the knock and talk when the police investigation is focused on a particular individual and require a warrant when police go to that individual's residence. The law permitting the use of the knock and talk as expressed by the Supreme Court of Kentucky in *Quintana*, *supra*, remains good law in the Commonwealth. "[A]s an intermediate appellate court, this Court is bound by established precedents of the Kentucky Supreme Court. [Kentucky Rules of the Supreme Court (SCR)] 1.030(8)(a). The Court of Appeals cannot overrule the established precedent set by the Supreme Court or its predecessor court." *Smith v. Vilvarajah*, 57 S.W.3d 839, 841 (Ky. App. 2000) (citing *Special Fund v. Francis*, 708 S.W.2d 641, 642 (Ky. 1986)).

-12-

about a crime that has been committed, a pending investigation, or matters of

public welfare." *Id.* at 756. Although, the Court noted that "[c]ontroversy may

arise when the officer is not looking for assistance from the resident, but rather is

using the procedure to look for evidence of wrongdoing by the resident, and

approaches the home to ask for consent to search or to aid in spotting evidence in

plain view or plain smell." *Id*. at 757.

The *Quintana* Court's discussion necessarily addressed the issue of

curtilage.

> Since officers must walk onto the property and up
> to the house itself to reach the door to knock, as opposed
> to looking from the street or a public sidewalk, the rights
> one has to the curtilage of the house are relevant. . . .
> The concept of curtilage began in common law,
> extending the same protection afforded the inside of
> one's home to the area immediately surrounding the
> dwelling. *United States v. Dunn*, 480 U.S. 294, 107 S.
> Ct. 1134, 94 L. Ed. 2d 326 (1987). In *Oliver v. United
> States*, 466 U.S. 170, 104 S. Ct. 1735, 80 L. Ed. 2d 214
> (1984), the United States Supreme Court recognized that
> the Fourth Amendment protects the curtilage of a house,
> and the area covered extends to that which an individual
> may reasonably expect to be treated as the home itself.
> In *Dunn*, the Supreme Court established four analytical,
> non-exclusive factors which should be applied to solve
> curtilage questions: the proximity of the area to the
> home, whether the area is included in an enclosure with
> the home, how the area is used, and the steps the resident
> has taken to prevent observation from the people passing
> by. Because there is no expectation of privacy for
> anything that can be observed from outside the curtilage,
> either by sight or other senses, the focus of a knock and

> talk analysis must be on the right of access to private property within the curtilage.

*Id*. The Court went on to discuss the main entrance to a residence, which it stated is "widely perceived by the public as the point of access for the public engaged in legitimate business, whether it is by pollsters, persons seeking assistance, postal carriers, delivery persons, or Girl Scouts selling cookies[.]" *Id*. at 758. This perception "amounts to common knowledge that the public may at least go up to a home's front door, if the way is not barred." *Id*. And while these members of the public "are not guaranteed access to the inside of the house, they may certainly approach the entrance and attempt to speak with the residents." *Id*. As to police officers, "[w]hether an officer is where he has a right to be when he does the knock and talk is defined by his limited purpose in going to the residence and the nature of the area he has invaded." *Id*. at 759.

In contrast, the *Ousley* Court held that a trash pull was not a legitimate reason for officers to invade the curtilage of a residence without an attempt to contact the defendant or other residents of the house. "Where the officer seeks only to search and does not interact with the resident, he has no 'legitimate' purpose as understood in the knock-and-talk cases, and thus he steps outside *Quintana* and onto the Fourth Amendment." 393 S.W.3d at 30. *See also Florida v. Jardines*, 569 U.S. 1, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013) (in which the

Supreme Court held that there was no customary invitation to use a narcotics dog to explore the area around a residence).

In the present case, we agree with the Commonwealth that the troopers had a lawful right to enter the curtilage of Adkins's property to conduct a knock and talk at his front door. Adkins makes much of the fact that the yard was fenced and that the troopers had to enter the yard through a gate that bore "no trespassing" and "beware of dog" signs. However, there is no evidence that the gate was locked, and the troopers did not need to break through a barrier to get to the front door of the residence, where members of the public would also be able to approach. The troopers were there on legitimate police business to follow up with Adkins on the non-anonymous citizen tip they received earlier that day. They were first there to make contact with Adkins, not to search for and seize evidence of a crime. The information they received from Adkins would of course direct their investigation to whether the citizen tip was legitimate and whether there was any evidence that might be located. But that is a different question from whether the troopers had a right to enter the curtilage to approach the front door.

Second, we shall consider whether Trooper Tyree invaded the curtilage and violated Adkins's Fourth Amendment rights when he approached the back door of the residence. The Commonwealth presents a two-part argument and contends that this was lawful because Trooper Tyree was only seeking to make

contact with Adkins and because the encounter was consensual and the curtilage

breach was therefore licensed.

The first argument is that Trooper Tyree's decision to approach the

back door was permissible because he was only seeking to make contact with

Adkins, a similar argument as to why the approach to the front door was

permissible.

In *Quintana*, the United States Supreme Court made it clear that "[t]he

back door of a home is not ordinarily understood to be publicly accessible, and

thus could be subject to the curtilage rules where the front door would not be."

276 S.W.3d at 759.

> [W]hen an officer leaves the approach to the main
> entrance of a residence, a separate and distinct curtilage
> question arises. The trial court is tasked with
> determining separately whether the new area where the
> officer ventures is within the protected curtilage of the
> home. To determine this, the four-factor analysis of
> *Dunn* must be applied: proximity to the house, whether
> the area is enclosed with the house, how the area is being
> used, and what the resident has done to secure his
> privacy. If the area is determined to be within the
> protected curtilage, then the officer is not in a place
> where he has a right to be, and any evidence thus
> illegally seized must be suppressed. *United States v.
> Jenkins*, 124 F.3d 768 (6th Cir. 1997).

*Quintana*, 276 S.W.3d at 760. But the United States Supreme Court held that

"[w]hen a law enforcement officer physically intrudes on the curtilage *to gather

evidence*, a search within the meaning of the Fourth Amendment has occurred.

-16-

*Jardines*, 569 U.S. at 11, 133 S. Ct. [at 1417].  Such conduct thus is presumptively unreasonable absent a warrant."  *Collins v. Virginia*, 584 U.S. 586, 593, 138 S. Ct. 1663, 1670, 201 L. Ed. 2d 9 (2018) (emphasis added).

In the present case, the only testimony on this issue establishes that Trooper Tyree was not attempting to gather evidence when he made his way to the back door.  He was not conducting a search; rather, he was attempting to contact Adkins, whom he and Trooper Whitmore had heard inside the house when they knocked on the front door.  "The constitutionality of such entries into the curtilage hinges on whether the officer's actions are consistent with an attempt to initiate consensual contact with the occupants of the home."  *Ousley*, 393 S.W.3d at 30 (quoting *United States v. Perea-Rey*, 680 F.3d 1179, 1187-88 (9th Cir. 2012)) (emphasis omitted).  Trooper Tyree went to the back yard in order to initiate consensual contact with Adkins, which we hold is permissible under the circumstances of this case.

Second, the Commonwealth argues that Trooper Tyree's intrusion onto Adkins's curtilage was consensual or licensed.  Before Trooper Tyree reached the back door, Adkins had exited the residence through that door, and Adkins then invited both troopers to the garage where they had a voluntary conversation.  This is the only testimony on this issue.  There is no evidence that the troopers forced Adkins out of the residence or that their interaction was coerced.  Furthermore, the

troopers did not discover any evidence as a result of the alleged intrusion of Adkins's curtilage; the evidence was discovered after Adkins consented to the search of his residence.

Therefore, under the limited circumstances of this case and while recognizing that this is a closer call, we hold that Trooper Tyree did not violate Adkins's Fourth Amendment rights when he made his way to the back door of the residence to make contact with him.

Alternatively, the Commonwealth asserts that Adkins's voluntary consent to the search of the residence dissipated any illegality if Trooper Tyree indeed unlawfully breached the curtilage.

First, we agree with the Commonwealth that the evidence of record establishes that Adkins voluntarily consented to the search of the residence. "Courts must determine voluntariness of consent based upon an objective evaluation of police conduct and not by the defendant's subjective perception of reality." *Payton v. Commonwealth*, 327 S.W.3d 468, 474 (Ky. 2010) (internal quotation marks and citations in footnote omitted).

> Factors relevant to voluntariness of consent include: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. Factors relevant to whether consent was an

-18-

independent act of free will include: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct.

*Baltimore v. Commonwealth*, 119 S.W.3d 532, 541 n.34 (Ky. App. 2003) (internal citations omitted).

Trooper Whitmore testified at the hearing that Adkins consented to a search of the residence. Adkins testified that he told the troopers that "he really could not give consent to go in the house or not" because his mother owned it, that he had heard a search warrant was on the way, and that the troopers told him they would not leave until they searched the house. Because Trooper Whitmore testified that he had consented to the search and a search actually took place, Adkins's testimony is not credible, and the only other evidence as to consent is Trooper Whitmore's testimony. There is no evidence that the interaction between the troopers and Adkins was coercive or overbearing, and as we noted above, the circuit court's findings to this effect were not based on substantial evidence in the record.

And second, we agree that Adkins's voluntary consent to the search of the residence dissipated any illegality.

> "Even if a consent later followed, when an individual consents to a search after an illegal entry is made, consent is not valid and suppression is required of any items seized during the search[,] unless the taint of the initial entry has been dissipated before the consents to

-19-

search were given." *U.S. v. Hardin*, 539 F.3d 404, 424 (6th Cir. 2008) (internal quotations and citations omitted). "The Commonwealth bears the burden of demonstrating that consent was freely obtained." *Milam v. Commonwealth*, 483 S.W.3d 347, 352 (Ky. 2015).

As the Court of Appeals stated in *Stevens v. Commonwealth*, 354 S.W.3d 586, 591 (Ky. App. 2011), and as we later acknowledged in *Milam*, 483 S.W.3d at 352,

> a subsequent consent to search may dissipate the taint of a prior illegality . . . . The admissibility of the challenged evidence involves a two-part test: (1) whether the consent was voluntary and (2) whether the consent was an independent act of free will.
>
> . . .
>
> Looking at the second inquiry, [f]actors relevant to whether consent was an independent act of free will include: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct.

*Stevens*, 354 S.W.3d at 591 (internal quotations and citations omitted) (holding that a defendant's wife's consent to search was voluntary and attenuated enough to remove the taint of the officers' improper search of a Kawasaki on the defendant's property).

*Pace v. Commonwealth*, 529 S.W.3d 747, 758 (Ky. 2017).

Any taint that may have arisen from Trooper Tyree's incursion into

Adkins's curtilage was dissipated by his consent given of his own free will. And

-20-

even if Trooper Whitmore did tell Adkins that they were getting a search warrant, as Adkins testified and which the trooper denied, the threat to do so was not baseless. *See United States v. Salvo*, 133 F.3d 943, 954-55 (6th Cir. 1998) ("Agent Williamson testified that prior to going to Salvo's room, he had sufficient information to obtain a search warrant. . . . There is no evidence on the record that the agents' statements that they would secure a search warrant if Salvo did not consent were baseless or a pretext to coerce Salvo, and, therefore, the statements do not render Salvo's consent involuntary.").

The troopers in this case had probable cause to obtain a search warrant based upon the citizen tip that Adkins was selling drugs from the residence. *See Commonwealth v. Kelly*, 180 S.W.3d 474, 478 (Ky. 2005) ("[M]any federal and state jurisdictions have held that tips provided by citizen informants who either (1) have face-to-face contact with the police; or (2) may be identified are generally competent to support a finding of reasonable suspicion (and in some cases, probable cause)[.]"). The troopers had also detected the odor of marijuana coming from inside of the residence when properly at Adkins's front door. *See Piercy v. Commonwealth*, 303 S.W.3d 492, 498 (Ky. App. 2010) ("Objects exposed to the plain view or smell of officers are not protected by the Fourth Amendment. . . . There are three requirements for application of the plain view/smell doctrine: (1) the viewer or person detecting the odor had the right to be in position for the view

or smell; (2) the viewer or person detecting the odor must have a lawful right to access the object or odor; and (3) the incriminating nature of the object or smell was immediately apparent to the viewer or the person detecting the odor.").

Finally, we agree with the Commonwealth that Adkins's invitation to the troopers to go to the garage to talk constituted an intervening circumstance between the alleged misconduct (invading the curtilage) and Adkins's eventual consent. *See Pace*, *supra*.

For the foregoing reasons, the order of the Pike Circuit Court granting Adkins's motion to suppress is reversed, and this matter is remanded for further proceedings.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Russell Coleman
Attorney General of Kentucky

Courtney J. Hightower
Assistant Attorney General
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Lawrence R. Webster
Pikeville, Kentucky